Appellant, Brent Upton, is appealing his conviction for murder. For the following reasons, the decision of the trial court is affirmed, as modified.
Appellant contends that his constitutional rights were violated by the prosecutions excusing venire members of the same race as appellant. Appellant is an African-American. Three African-Americans were in the initial venire of potential jurors. The prosecutor used peremptory challenges to excuse two of the three African-American venire members. The prosecutor stated that he excused Ms. Embry because she did not see the difference between the phrases "firmly convinced" and "absolutely certain."
The prosecutor stated that he excused Mr. Smith because: (1) Mr. Smith stated that he had been a victim of several crimes, but, "you shrug them off." (2) When asked if any family members had been the victims of crimes, Smith replied, "Well, I got a couple of nephews right now with their mother." The prosecutor felt this was a strange way of phrasing that the nephews mother had been murdered. (3) Smith stated, "I dont want to sit and be in judgment of nobody but its my civic duty, so I accept it."
The prosecutor stated that he was satisfied with the remaining African-American juror. The prosecutor said, "I grilled him more than anybody else." The prosecutor excused two Caucasian venire members on peremptory challenges.
 I.
Appellants first assignment of error states:
 THE TRIAL COURT DENIED APPELLANT A FAIR TRIAL AND VIOLATED THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION WHERE THE STATE WAS PERMITTED TO EXAMINE AND EXCUSE VENIRE MEMBERS OF THE SAME RACE AS APPELLANT IN A MANNER INCONSISTENT WITH BATSON v. KENTUCKY (1986), 476 U.S. 79.
It is a violation of the equal protection clause to exclude jurors on the basis of race. Batson v. Kentucky (1986),476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712. The defendant must present a prima facie case that the circumstances raise an inference of discrimination. Id., State v. Hernandez (1992), 63 Ohio St.3d 577. Then the burden shifts to the state to articulate a racially neutral reason for excusing the venire member. Id. Unless a discriminatory intent is inherent in the prosecutors explanation, the reason offered will be deemed racially neutral. Hernandez v.New York (1991), 500 U.S. 352, 360, 114 L.Ed.2d 395,111 S.Ct. 1859. The explanation given by the prosecutor does not have to be persuasive or even plausible. Purkett v. Elem (1995),514 U.S. 765, 131 L.Ed.2d 834, 115 S.Ct. 1769.
Once the prosecution advances a non-discriminatory reason, the trial court must decide whether the defendant carried his burden to prove purposeful discrimination. Batson; Hernandez v. New York,State v. Hernandez, supra. The trial court must make a factual determination as to whether the reason advanced by the prosecutor was merely a pretext for discrimination. Purkett, supra. As this determination is based on the observation of the voir dire process and the credibility of the prosecutor, a reviewing court must afford great deference to the trial courts determination. SeeHernandez v. New York; Purkett, supra. The trial courts conclusion that the state did not exclude jury members for discriminatory reasons will not be reversed unless this conclusion was clearly erroneous and/or not supported by the record. State v.Hernandez; Hernandez v. New York; Purkett, supra.
The prosecutor advanced non-discriminatory reasons for excusing two of three African-American jurors. The reasons were supported by the record. The trial court concluded that the reasons advanced by the state were not merely pretexts for discrimination. After a careful review of the record, we find that the trial courts conclusion was not clearly erroneous. The trial court did not err in determining that venire members were not excluded on the basis of race.
Accordingly, this assignment of error is overruled.
 II.
Appellants second assignment off error states:
 THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE IS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT THE ELEMENTS OF THE OFFENSE HAS BEEN PROVEN BEYOND A REASONABLE DOUBT.
In determining if a conviction is against the manifest weight of the evidence, the appellate court reviews the record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin (1983), 20 Ohio App.3d 172, citing Tibbs v. Florida (1982), 457 U.S. 31.102 S.Ct. 2211, 72 L.Ed.2d 652. The court should consider whether the evidence is credible or incredible, reliable or unrealiable, certain or uncertain, conflicting, fragmentary, whether a witness was impeached and whether a witness had an interest in testifying.State v. Mattison (1985), 23 Ohio App.3d 10. The credibility of a witness is primarily an issue for the trier of fact, who observed the witness in person. State v. Anthill (1964), 176 Ohio St. 61,State v. DeHass (1967), 10 Ohio St.2d 230.
The following evidence was presented at trial:
Fannye Holivay testified that she is the mother of the victim, Sonja Holivay. On June 25, 1997 at 6:30 a.m., appellant came to her home and was yelling that Sonya had slit her throat.
Detective Thomas Bunyak off the Parma Police Department testified that at 7 a.m., he arrived at the victims apartment. He observed Sonja Holivay slumped over on the bathroom floor with her head resting on the toilet bowl. Her face and throat were cut. Two feet away from the body was a knife. In the victims bedroom, clothes were taken out of a dresser drawer and thrown onto the floor. A white powdery substance was on the shelves inside the dresser.
Bunyak took pictures through the peephole of the apartment directly across from victims apartment. The neighbor across the hall said she saw the murder through her peephole. Bunyak testified that with the victims door open, one could see down the victims hallway and into her bathroom.
Bunyak searched appellants apartment. A set of three knives were recovered which matched the style off the knife found near the victims body.
The assistant coroner, Dr. Heather Nielson-Raaf, testified that the victim sustained knife wounds to her face and neck and bruises on her face, neck and chest. The cut on her neck was shallow, and was not sufficient to cause death. The coroner concluded that the cause of death was a homicide by strangulation.
Denise Williams, also known as "Lala", testified that around eleven or twelve on the evening of June 24, she was at the victims apartment. Sonja, appellant and Maurice Calhoun were also there. Appellant gave Williams $1,500 in cash. Around midnight or 1:00 a.m., Williams left Sonjas apartment to go to Western Union. Appellant and Calhoun followed Williams to make sure she got on the highway. Appellant and Calhoun were driving the victims black Mercury Mountaineer. Later, Williams saw appellant and some other men in the black Mountaineer. Williams sent $4,600 via Western Union at 2:40 a.m. to Jamahl in California.
Randy Zimmerman testified that around 1:35 a.m. on June 25th, he was at his home on W. 54th. Maurice Calhoun and appellant came over in a black truck, inquiring as to the whereabouts of Chad Padgett. Zimmerman, Calhoun and appellant picked up Padgett. The four men drove to the east side to appellants sisters. On the way, they saw Lala in her vehicle. At 3:00 a.m., Zimmerman was dropped off at home.
Chad Padgett testified that appellant was looking for him because he was holding the keys to appellants home. After dropping off Zimmerman at 3:00 a.m., they proceeded to Sonjas apartment. They pounded on Sonjas door, but no one answered. Padgett went outside and threw objects at the apartment window. When the police arrived, appellant told them that Sonja had just called him twenty minutes ago. Padgett said no such phone call or page took place. Appellant asked the police to break down the door, but the police refused. The three men drove to appellants apartment to retrieve the keys to Sonja s apartment.
Padgett testified that appellant asked Padgett and Calhoun to return to Sonjas apartment and get appellants medication. Calhoun was shaking as he struggled to unlock Sonjas door. Once inside the apartment, Padgett saw a knife and Sonjas body on the floor. Before Calhoun even saw the body, he leaped around Padgett and said that Sonja had killed herself. Calhoun attempted to call 911. Padgett told him not to call from the crime scene for fear of becoming suspects. Padgett attempted to call 911 from two pay phones, but the phones did not work. They went to appellants home and called 911.
Padgett stated that appellant sells drugs for a living.
Maurice Calhoun testified that they left Sonjas at 11:00 p.m., but later testified that they left at 12:30 or 1:00 a.m. While they were at appellants sisters, Sonja paged appellant. When he and Padgett returned to Sonjas apartment, it was Padgett who fumbled with the keys and appeared scared. Padgett unlocked the door and they saw Sonjas body. When Calhoun was about midway to the bathroom he said, "Oh, Sonja, why did you do this to Jaizonne?" Jaizonne is Sonjas two year old son. Padgett wiped off the phone and the doorknob with his shirt.
Calhoun believed that Sonja killed herself because appellant was seeing five other women besides Sonja. Calhoun denied that he or appellant killed Sonja. He did not know if Chad Padgett killed Sonja. Calhoun said that the set of knives, one of which was the murder weapon, were Sonjas not appellants.
Raymond Buettner testified that he lived in the apartment next door to Sonja. At 3:00 a.m., Buettner heard heavy pounding. Then he heard someone leave Sonjas apartment. Buettner looked out his window into the back parking lot, and saw a black blazer squealing out of the lot. Five or ten minutes later, a vehicle came back in. Then, he heard someone pounding on Sonja's door. Buettner called the police at 3:23 a.m. because off the noise.
Police Sergeant John Kalal testified that he went to the victims apartment in response to Buettners 911 call. Appellant could not prove that he lived there, so the police told appellant and his friends to leave. At 5:14 a.m., the police received a 911 call from appellant. The police went to Sonjas apartment and discovered her body. The neighbor across the hall, Tora Williams, identified Calhoun as being in the apartment when Sonja was killed. She identified appellant as the murderer.
Tora Williams testified that she lived in the apartment across the hall from Sonja Holivay. Around 1:00 a.m., she saw appellant and Maurice Calhoun return to the appellants apartment in the black Mountaineer. The door to Sonjas apartment was open. Williams could see Sonja in the bathroom leaning over the toilet. She heard the toilet flush twice. Appellant said, "Where is my fucking shit at? Why is all these fucking clothes all over the room?" Brent went into the bathroom with Sonja. Appellant said, "Look what this bitch done did." Appellant grabbed Sonjas neck. He removed something shiny from the pocket of his shorts. Sonja slumped down on the floor. Appellant and Calhoun immediately left the apartment, around 2:30 or 3:00 a.m.
Tora further testified that about 3:15 or 3:30 a.m., appellant and Calhoun returned and knocked on Sonjas door. The police came. When the police returned at 5:20 a.m, Tora told them appellant was the murderer. In her statement to the police, Williams said that the murder happened about 1:30 or 1:45 a.m.
Jeffrey Houser, a forensic scientist testified that the white powdery substance removed from the dresser tested positive for cocaine. Water samples removed from the toilet tested negative for cocaine.
Ingrid Berg testified that appellant was grief stricken when he heard about Sonjas death. Berg said that the knife set belonged to Sonja, not appellant. Appellant had no utensils in his apartment, although he lived there with his fiancee and her baby.
Appellant testified that he did not kill Sonja. He did not sell drugs in 1997.
Based on the above facts, we can not say that the jury clearly lost its way in choosing to believe the testimony of Tora Williams over the testimony of appellant and Calhoun. There was evidence, including the jury view, showing that Williams could see into the victims apartment from her peephole. The murder weapon matched a set of knives in appellants apartment. Buettners testimony indicated that someone left the apartment and took off in the black Mountaineer, then returned and pounded on the door. Padgetts testimony implied that Calhoun already knew they were going to find Sonjas body, and was attempting to make it look like a suicide. Calhouns testimony that he could tell Sonja had killed herself when he was midway to the bathroom is incredible. Photographs demonstrated that the victim was facing the other way, so her neck could not be seen. Several aspects off appellants testimony did not seem credible and/or were contradicted by other witnesses. We conclude that the conviction was not against the manifest weight of the evidence.
Accordingly, this assignment of error is overruled.
 III.
Appellants third assignment of error states:
 THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT CREDIT FOR TIME SERVED DURING THE PENDENCY OF HIS CASE, IN VIOLATION OF R.C. 2967.191 AND CRIM. R. 32(C).
The trial judge stated on the record that he was not able to grant credit for time served under Senate Bill 2. This appeal was filed on December 2, 1997. On June 17, 1998, the trial court issued a nunc pro tunc journal entry granting credit for time served.
The prosecution concedes that appellant should be given credit for time served, as mandated by R.C. 2967.191. The trial courts "nunc pro tunc" journal entry does not succeed in granting credit for time served because it is void for lack of jurisdiction. After an appeal is filed, the trial court is ordinarily divested of all jurisdiction inconsistent with that of the appeals court to modify, reverse, affirm or review its judgment. McAuley v. Smith (1998),82 Ohio St.3d 393, 395. Civ.R. 60(A) provides an exception. Clerical errors can be corrected any time by the trial court, but leave is required if an appeal is docketed. Civ. R. 60(A). The journal entry in question was not a nunc pro tunc journal entry to correct a clerical error, because it was not what the court actually decided. See State ex rel. Ditty v. Leskovyansky (1996) 77 Ohio St.3d 97,100. Additionally, no leave of court was obtained from the Court of Appeals to enter a nunc pro tunc journal entry. The decision of the trial court should be modified to grant appellant credit for time served.
Accordingly, this assignment of error is sustained.
 IV.
Appellant submits one pro-se assignment of error, which states:
 THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO REQUEST INSTRUCTIONS ON ALIBI AND MIS-IDENTIFICATION OR OBJECT TO THE COURTS FAILURE TO GIVE SUCH INSTRUCTIONS WHERE THE EVIDENCE OF ALIBI AND MISIDENTIFICATION WAS PRESENTED ON THESE DEFENSES DURING TRIAL.
To demonstrate ineffective assistance of counsel, appellant must show that counsel substantially violated an essential duty, and that appellant was prejudiced by counsels errors. Stricklandv. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674,State v. Bradley (1989), 42 Ohio St.3d 136. Prejudice occurs when there is a reasonable probability that but for counsels unprofessional errors, the result of the proceedings would have been different. Strickland at 694.
To be entitled to an alibi defense, there must be at least a scintilla of evidence establishing an alibi. State v. Payne
(1957), 104 Ohio App. 405, State v. Miller (Mar. 21, 1992) Cuyahoga App. No. 59987, unreported.
 A trial courts instructions to the jury on alibi are little more than a reminder that evidence of alibi was introduced. * * * If the defendant is found, beyond a reasonable doubt, to have committed the crime, then the jury necessarily must have considered and disbelieved the evidence of alibi.
State v. Sims (1982), 3 Ohio App.3d 331, at 335. This court has followed the Sims reasoning to hold that, where the record supports a finding of guilt beyond a reasonable doubt and the appellant cannot show that the result would have been different had the jury been instructed on the defense of alibi, the failure to instruct is not reversible error. State v. Miller, supra State v. King (Nov. 14. 1996), Cuyahoga App. No. 68726, unreported.
Appellant did not have an alibi from 3:00 a.m. to 3:30 a.m., as the evidence places him at the victims apartment. The murder could have occurred during this time. It is questionable whether appellant was entitled to an alibi instruction. Appellants alibi from 12:30 a.m to 1:35 a.m. was that he and Calhoun were driving around looking for Padgett. Tora Williams testified that Calhoun was in Sonjas apartment at the time of the murder. The jury rejected the alibi testimony and found beyond a reasonable doubt that appellant committed the murder. Appellant can not show that the result would have been otherwise had the alibi instruction been given. Appellant was not prejudiced by the lack of an alibi instruction.
Appellant also states that an instruction on misidentification should have been given. A special jury instruction on eyewitness identification is not required if the infirmities which attach to eyewitness identification are absent from the facts of the case. See State v. Guster (1981), 66 Ohio St.2d 266, 272. Tora Williams testified that she was acquainted with appellant. The infirmities which attach to eyewitness identification were absent in this case. Appellants counsel did not violate an essential duty by failing to request an instruction on misidentification.
Accordingly, this assignment of error is overruled.
The decision of the trial court is modified to give appellant credit for 129 days served, and otherwise the conviction is affirmed.
It is ordered that appellee and appellant split the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court to carry this judgment into execution. The defendants conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PORTER, A.J., AND
POCCO, T., CONCUR.
ANN DYKE, JUDGE